Cathy NEELY, Plaintiff–Appellee–Cross Appellant,

v.

Stephen FEINSTEIN, et al., Defendants–Appellants–Cross Appellees.

Nos. 93–35910, 93–36174.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1995.

Decided April 3, 1995.

---

Robert B. Rocklin, Asst. Atty. Gen., Salem, OR, for defendants-appellants-cross appellees.

Robert S. Banks, Jr., Banks Newcomb, Portland, OR, for plaintiff-appellee-cross appellant.

Before: PREGERSON, TROTT, Circuit Judges, and FITZGERALD,* District Judge.

PREGERSON, Circuit Judge:

Defendant Stephen Feinstein, a former superintendent of the Eastern Oregon Psychiatric Center ("EOPC"), appeals the district court's judgment denying him qualified immunity in Plaintiff Cathy Neely's action against him for failing to protect her from sexual abuse while she was a patient at EOPC. Neely also named as defendants John Brown, Jane Beshore,[1] Linda Murgo, and Cecilia Hosley, other employees of EOPC. The district court granted qualified immunity to these defendants. Neely cross-appeals these grants of qualified immunity.

Pursuant to the collateral order doctrine, we have jurisdiction over interlocutory appeals from orders denying summary judgment on the basis of qualified immunity.

*Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985); *Act Up!/Portland v. Bagley,* 988 F.2d 868, 870 (9th Cir.1993).[2] We affirm the district court's denial of qualified immunity to Feinstein, and the court's grant of qualified immunity to Murgo, Hosley, and Brown.

## BACKGROUND

Plaintiff Cathy Neely, a former patient at the Eastern Oregon Psychiatric Center ("EOPC"), alleges that during the course of her treatment at EOPC, from May 4, 1990 to June 8, 1990, Jess Terry, a psychiatric aide, sexually abused her on a number of occasions. The allegations are as follows: Terry made several sexual remarks and innuendos to Neely; on one occasion, when Neely was using the bathroom, Terry grabbed Neely's breasts and kissed her; and while Neely was in one-to-one seclusion[3] with Terry, he unzipped his pants and exposed himself to Neely, rubbed her vagina and told her to "cooperate," and laid on top of Neely with a noticeable erection.

The record shows that before Neely made her accusations, two other patients had made similar accusations against Terry. In October 1988, a patient ("1988 patient") told her mother and the hospital chaplain, Father Baumgartner, that Terry had sexually abused her. The 1988 patient filed a formal complaint against Terry, alleging that Terry put his hands down her pants, fondled her vaginal area and her breasts, and told her that he had seen her lying naked in bed at night and wanted to jump in with her.

Defendant Stephen Feinstein, the superintendent of EOPC, during all relevant times referenced herein, then convened a committee to investigate the charges. The committee consisted of Linda Murgo, the chair of

---

* The Honorable James M. Fitzgerald, Senior U.S. District Judge for the District of Alaska, sitting by designation.

1. Although Neely named Beshore as a defendant in her complaint, Neely is not appealing the district court's grant of qualified immunity to Beshore.

2. Feinstein also urges us to consider whether he is entitled to summary judgment as a matter of law on the merits of this case. Because the

record shows that the district court has not entered a final judgment, this issue is not now appealable. 28 U.S.C. § 1291. We only address here the issue of qualified immunity.

3. One-to-one seclusion is a form of therapy used to control violent patients. The patient is confined in a small room with one staff person who stays with the patient until the violent period is over.

the committee, Jane Beshore, and Chris Guindon. The committee interviewed the 1988 patient, Dr. Miller, her treating psychiatrist, and Jess Terry. The committee did not interview the 1988 patient's mother, Father Baumgartner, nor the patient's treating psychologist. The committee concluded that there was "no evidence to substantiate the charge." Feinstein concurred with the committee's finding and did not order any disciplinary action against Terry.

In March 1989, a second patient ("1989 patient") filed a complaint against Terry for sexually abusing her. The 1989 patient alleged that Terry put his hands in her pants and his finger in her vagina, and that while he was giving her a back rub, he fondled her breasts. Feinstein convened a committee to investigate these allegations and appointed the same three members from the 1988 committee to this committee.

The committee interviewed the 1989 patient, Jess Terry, Bill Wood, another staff person, Dr. Condon, the 1989 patient's treating psychologist, three patients, and a patient who witnessed the incident in which Terry allegedly fondled the 1989 patient's breasts. Dr. Condon testified that the 1989 patient's complaint was credible, and the witness to the breast fondling incident confirmed the 1989 patient's account of the incident. Three patients testified that Terry "came on to" female patients, was a "flirt," and once touched the breasts of a female patient while taking her blood pressure.

The committee concluded that there was no evidence to substantiate the allegations against Terry. Feinstein again concurred with the committee's finding. But this time, he issued Terry a written reprimand for "poor judgment." Feinstein also submitted a report to the State's Administrator of the Mental Health Division, in which he noted that despite the lack of any evidence to substantiate the allegation, Terry "displayed very poor judgment in placing himself in situations where he was alone with the patient."

In response to these allegations, Cecilia Hosley, the Director of Nursing, ordered Terry to sign a "Work Plan and Progress Review." This document listed several "goal statements" by which Terry agreed to abide. He agreed not to place himself in a position of being alone with a female patient, not to encourage physical contact with patients, not to go to the women's ward without good cause and without first notifying a staff member of his intended visit, and to maintain an appropriate therapeutic approach and/or distance with female patients at all times. Terry's work plan only applied to him, and did not restrict his supervisors from assigning him to work with female patients. The work plan was the only written document that stated that Terry should not work with female patients. The work plan was not circulated to Terry's supervisors.

However, at an administrative meeting, Hosley orally notified the supervisors of all the shifts that Terry should not be assigned to the women's ward nor to one-to-one seclusion with a female patient. Hosley did not put this directive in writing.

After complaints from other staff about their increased workload in the women's ward as a result of Terry's women's ward restriction, Hosley lifted the restriction some time before May 1990, but retained the one-to-one seclusion restriction.

On May 6, 1990, John Brown, a building supervisor, assigned Terry to the women's ward in which Neely was housed. Vicky Courtright, a nurse, then assigned Terry to stay with Neely in one-to-one seclusion. The record shows that Brown attended the meeting in which Hosley notified supervisors of the restrictions on Terry's assignments, but that Courtright did not. It is unclear whether Brown approved the one-to-one assignment with Neely. In any event, it was during the time of this one-to-one seclusion that Terry allegedly lay on top of Neely.

On December 10, 1992, pursuant to 42 U.S.C. § 1983, Neely brought the instant action in the United States District Court for the District of Oregon. Neely asserted that Feinstein, Murgo, Beshore, Hosley, and Brown violated her constitutional right to personal security under the due process clause of the Fourteenth Amendment. On November 3, 1993, the district court denied Feinstein qualified immunity, and granted

qualified immunity to Murgo, Hosley, and Brown. Feinstein now appeals the district court's order denying him qualified immunity, and Neely cross-appeals the district court's grant of summary judgment to Murgo, Hosley, and Brown.

### ANALYSIS

■ We review both the district court's denial of qualified immunity and the court's grant of qualified immunity de novo. *Act Up!*, 988 F.2d at 871.

#### A. Defendant Feinstein

The district court concluded that Feinstein was not entitled to qualified immunity because the law was clearly established that hospital officials must ensure their patients' safety, and that the record contained sufficient evidence to support a showing that Feinstein was deliberately indifferent to the risk that Terry would sexually abuse female patients. We agree.

■ In *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the Supreme Court clarified the test for denying qualified immunity. The Court stated that: "The contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." This standard thus involves a two-part analysis: (1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful? *Act Up!*, 988 F.2d at 871.

We hold that the district court correctly applied this standard in denying Feinstein qualified immunity. We note at the outset that "the law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty." *Alexander v. Perrill*, 916 F.2d 1392, 1397 (9th Cir.1990).

1. Was the Law Clearly Established?

■ A mental patient's right to personal security in the institution to which he or she is committed was clearly established in 1988, when the first charge of sexual abuse was made against Terry. In *Youngberg v. Ro-*

*meo*, 457 U.S. 307, 316–17, 102 S.Ct. 2452, 2458–59, 73 L.Ed.2d 28 (1982), the Supreme Court explicitly affirmed the right of mental patients to safe conditions:

> If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.

The Court also articulated the test for scrutinizing the actions taken by officials to ensure patient safety:

> [L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462.

In *Estate of Conners by Meredith v. O'Connor*, 846 F.2d 1205 (9th Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989), a mental patient in a state psychiatric hospital was raped and murdered by another patient who was confined to the psychiatric hospital pursuant to a state penal code provision. The state penal code patient had committed an earlier rape and murder of another woman. The estate of the deceased patient sued hospital officials for failing to take adequate steps to prevent the murder.

Following *Youngberg*, we stated that "[l]iability may be imposed [when] ... [the official's] decision is so objectively unreasonable as to demonstrate that he or she actually did not base the challenged decision upon professional judgment." *Id.* at 1208. We equated the *Youngberg* standard "to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence." *Id.*

Although the *Conners* opinion used the term "conscious indifference," both parties in the case before us used the term "deliberate indifference" to describe the level of culpability required to hold Defendants liable under the due process clause of the Fourteenth Amendment.

The term "deliberate indifference" was first introduced by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court held that the deliberate indifference of prison officials to an inmate's serious medical needs constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* at 104, 97 S.Ct. at 291. In *Redman v. County of San Diego,* 942 F.2d 1435, 1442 (9th Cir.1991) (en banc), we extended the "deliberate indifference" standard used to measure violations of prisoners' rights to pretrial detainees, who may not be punished, and whose rights arise under the Fourteenth Amendment.

■ At oral argument, Defendants argued that under *Farmer v. Brennan,* — U.S. ——, ——, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994), a finding of "deliberate indifference" requires "a showing that the official was subjectively aware of the risk." We reject this argument. *Farmer's* subjective awareness standard has limited applicability in the context of psychiatric hospitals. The rights of patients in such institutions arise under the Fourteenth Amendment as opposed to the Eighth Amendment. The Court in *Farmer* noted that the subjective awareness requirement comported with the Eighth Amendment's proscription against cruel and unusual punishment because an official's misconduct cannot constitute *punishment* unless he or she was actually aware of a substantial risk to inmates' safety. *Id.* at ——, 114 S.Ct. at 1979.

■ Moreover, the *Youngberg* professional judgment standard is necessarily an objective test. A court must determine whether the mental hospital official's challenged conduct was "such a substantial departure from accepted professional judgment, practice, or standards." 457 U.S. at 323, 102 S.Ct. at 2462. Finally, our Fourteenth Amendment jurisprudence has never required officials to have a subjective awareness of the risk of harm in order to be deemed "deliberately indifferent." *See, e.g., Wood v. Ostrander,* 851 F.2d 1212, 1214 (9th Cir.1988) (gross negligence cognizable under § 1983); *Fargo v. City of San Juan Bautista,* 857 F.2d 638, 640 (9th Cir.1988) (grossly negligent or reck-less official conduct that infringes upon an interest protected by the due process clause is actionable under § 1983).

■ For the foregoing reasons, we hold that the standard articulated in *Conners,* the facts of which are most analogous to the case before us, is the standard that should govern Defendant's conduct: Mental hospital officials are liable if they exhibit "conscious indifference amounting to gross negligence." 846 F.2d at 1208. In *Conners,* we denied the hospital officials qualified immunity because we found that their failure to take adequate steps to prevent penal code patients from harming other patients, if proved, could establish their indifference to patient safety. *Id.* at 1208–1209. Thus, it was clearly established in 1988 that conscious indifference to patient safety is actionable under § 1983.

Furthermore, in *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986), we clearly established that state officials must take steps to protect prisoners from the *threat* of serious harm or injury by other prisoners, even if it is not certain that the harm will occur. We stated that while the official must have "more than a mere suspicion that an attack will occur," we do not require the official to "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault." *Id.* at 459 (internal quotations omitted).

■ The cases discussed above amply demonstrate that the law in our circuit clearly established that (1) patients have a constitutional right to be safe in the state institution to which they are committed, and that (2) in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring.

### 2. Was Feinstein's Conduct Reasonable?

■ The next question in the qualified immunity analysis is whether in the light of clearly established law, a reasonable official would have concluded that Feinstein took adequate steps to protect female patients

from the risk of sexual abuse by a staff member who has had two complaints of patient sexual abuse filed against him. In properly framing this question, we must bear in mind several considerations. First, the burden shifts to Feinstein to prove that a reasonable official would have believed that his actions were adequate to protect female patients from the risk of sexual abuse by a staff member. *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991) (Qualified immunity is an affirmative defense; if the plaintiff proves that the right allegedly violated was clearly established, the burden shifts to the defendant official to prove that his or her conduct was reasonable even though it might have violated the law.).

■ Second, although the reasonableness of an official's conduct has traditionally been a question for the jury, the most recent law of our circuit holds that it is now a question for the court. *See Act Up!,* 988 F.2d at 873 ("The determination of whether the facts alleged could support a reasonable belief in the existence of probable cause or reasonable suspicion is also a question of law to be determined by the court."). Thus, when courts assess the reasonableness of an official's conduct, "if the facts alleged by the defendant officer could not support a reasonable belief that his conduct was lawful, he is not entitled to qualified immunity." *Id.*

Finally, because the clearly established law governing Feinstein's conduct makes it unlawful for him to act with conscious indifference, as opposed to mere negligence, toward the safety of his patients, we must determine whether the facts alleged, if proved, are sufficient to support a finding that Feinstein was consciously indifferent. *See Conners, supra,* 846 F.2d at 1209 ("The facts alleged ... if proven, could reasonably support a trier's finding that the defendants were indifferent to patient safety....").

■ Thus, the precise question we now address is whether Feinstein satisfied his burden of proving that a reasonable official would have believed that his conduct was lawful, *i.e.,* that he was not acting with conscious indifference toward the safety of his female patients. We affirm the district court's conclusion that Feinstein failed to

meet this burden. The facts alleged by Neely, if proved, are sufficient to support a finding that Feinstein was consciously indifferent to the risk that Terry posed to the safety of female patients at EOPC.

As the district court found, because the gravity of potential harm threatened by Terry was high, the need for precautions was likewise high. Feinstein's only argument to support the reasonableness of his conduct is that he complied fully with the State Mental Health Division's rules for responding to allegations of patient abuse. E.R. 24. However, those rules are preceded by a general policy statement:

> [B]ecause of the nature of the services that the Division provides, a need exists for *vigilance* to protect patients and residents in state institutions from every form of physical and mental abuse, harassment, inappropriate use of restraint, *sexual exploitation,* and all other forms of demeaning conduct.

E.R. 27 (emphasis added).

Neely has alleged facts sufficient to support a finding that Feinstein exhibited indifference rather than vigilance in protecting the safety of female patients, and that a reasonable hospital official would have done much more to eliminate the risk that Terry would sexually abuse female patients under the hospital's care. Feinstein had before him substantial evidence that strongly indicated that Terry had a propensity to sexually abuse female patients. Two unrelated patients filed formal complaints against Terry for sexually abusing them in virtually the same manner: In each incident, Terry put his hands down the patient's pants, fondled her vaginal area, and touched her breasts. The evidence in the 1989 patient's allegation of sexual abuse included testimony from other patients who witnessed Terry touch the breasts of female patients. This is the very type of corroborating evidence required by the policy of the Eastern Oregon Psychiatric Center to substantiate an allegation of sexual abuse.

Nevertheless, even though Feinstein recognized after the 1989 allegation of sexual abuse that Terry had exercised "poor judg-

ment" in dealing with female patients, Feinstein concluded that the charges against Terry were not substantiated by corroborating evidence. A reasonable hospital official would not have disregarded so summarily the substantial evidence that pointed to Terry's misconduct.

Moreover, in the face of the known risks that Terry posed to female patients, Feinstein only issued Terry a written reprimand. Terry's work plan, in which Terry agreed not to work with female patients, only applied to him. The work plan was not an order that his supervisors were required to follow. The only order given to the supervisors that prohibited them from assigning Terry to work with female patients was one given orally by Hosley, the Director of Nursing, at a meeting that lasted ten to fifteen minutes. Feinstein failed to put this directive in writing to alert all supervisors who had responsibility for staffing the shifts, including those who were *not* present at the meeting with Hosley,[4] that Terry was prohibited from working with female patients.

Feinstein argues that the steps he took were reasonably sufficient to prevent Terry from sexually abusing female patients because Terry was restricted from working with female patients. Feinstein claims that he was not aware that Hosley had lifted the women's ward restriction shortly before Terry assaulted Neely. But there is evidence to show that the women's ward restriction proved to be insufficient even *before* it was lifted. Contrary to Hosley's assertion, Hosley Deposition at 59, Terry testified that supervisors assigned him "more than once" to the women's ward while the women's ward restriction was still in effect. Terry Deposition at 61–65. This fact, if proved, would serve as compelling evidence of Feinstein's indifference to the risk that Terry posed to female patients.

▮▮▮ A reasonable official would have known that the failure to take strong measures to prevent Terry from being assigned to the women's ward or to one-to-one seclusion with female patients would expose them

to a significant risk that Terry would sexually abuse them. Thus, a reasonable official would not have believed that the actions Feinstein took were sufficient. At the very least, a reasonable official would have made clear, in writing, the directive that prohibited Terry from working with female patients, and would have implemented appropriate procedures to ensure that he or she would be informed of any changes made to that directive.

▮▮▮ Feinstein argues that he should not be held liable for the failure of his subordinates to follow his orders. But Feinstein bears the responsibility for taking adequate steps to ensure that his subordinates follow his orders because, as the head of the Eastern Oregon Psychiatric Center, he is the one who is ultimately accountable for the safety of the patients.

Accordingly, we affirm the district court's conclusion that a reasonable official would not have believed that Feinstein's conduct was lawful, and that Feinstein's failure to take adequate steps to prevent Terry from sexually abusing female patients could constitute conscious indifference. The district court properly denied Feinstein qualified immunity as a matter of law.

We emphasize that our holding does not *require* a jury to find that Feinstein was consciously indifferent to the threat that Terry posed to Neely's safety. We only hold that because Neely alleged sufficient facts to support a reasonable finding in her favor, Feinstein's qualified immunity defense fails.

### B. Defendants Murgo, Hosley, and Brown

The clearly established law that hospital officials must take adequate steps to ensure patient safety, discussed *supra*, applies with equal force to Defendants Murgo, Hosley, and Brown. We thus proceed to the second prong of the qualified immunity inquiry, whether a reasonable official would have taken additional steps to prevent Terry from sexually abusing female patients.

---

4. As the facts discussed *supra*, show, Vicky Courtright, a nurse who was not present at the meeting with Hosley assigned Terry to the one-

to-one seclusion with Neely, where Terry sexually abused Neely.

### 1. Linda Murgo

 Murgo was the chairperson of both the 1988 and 1989 committees convened to investigate allegations that Terry had sexually abused female patients. Given that grave consequences could result from the failure to ascertain the guilt of an employee accused of sexually abusing a patient, it was incumbent upon Murgo to make sure that the committees conduct a thorough investigation and draw a reasoned conclusion.

Even though the 1988 committee did not interview the patient's mother nor the hospital chaplain, the two people to whom the 1988 patient reported the incident of sexual abuse, it did interview the patient and her psychiatrist. The hospital's regulations, which were not promulgated by Murgo, required no more. Accordingly, we conclude that the district court properly granted Murgo qualified immunity as a matter of law.

### 2. Cecilia Hosley

 Hosley was the Director of Nursing who convened the meeting of the shift supervisors to inform them that Terry should not be assigned to the women's ward or to one-to-one seclusion with female patients. Even though Hosley did not put this directive in writing to ensure that all supervisors who had responsibility for assigning shifts would abide by the restrictions, we cannot say that she acted unreasonably.

Hosley was never instructed by Feinstein, her superior, to put the directive in writing. Additionally, there is nothing in the record to establish that Hosley was personally apprised of the same evidence of Terry's prior sexual assaults that Feinstein reviewed. In the same vein, we cannot hold Hosley liable for lifting the women's ward restriction. The absence of a sufficiently strong directive from Feinstein served to understate, to all the staff members, the risk that Terry posed to female patients. Thus, the district court properly granted Hosley qualified immunity as a matter of law.

### 3. John Brown

 Brown was the building supervisor who assigned Terry to the women's ward.

Given that the women's ward restriction was lifted when Brown made the assignment, we cannot say that he acted unreasonably when faced with a staff shortage. Accordingly, we affirm the district court's grant of qualified immunity to Brown as a matter of law.

### CONCLUSION

For the foregoing reasons, we affirm the district court's denial of qualified immunity to Feinstein, and the district court's grant of qualified immunity to Murgo, Hosley, and Brown.

AFFIRMED.