Grace A. DORRIS, Plaintiff,

v.

**COUNTY OF WASHOE, Dianne Cornwall, Larry Beck, Gene McDowell, Jim Shaw, Steve Bradhurst, Vincent Swinney, Todd Vinger, and Does 1 through 10, inclusive, Defendants.**

CV–N–94–353–ECR.

United States District Court,
D. Nevada.

April 26, 1995.

Anne M. Vohl, Reno, NV, for plaintiff.

---

Gregory R. Shannon, Deputy Dist. Atty., Reno, NV, for defendants.

### *ORDER*

EDWARD C. REED, Jr., District Judge.

On June 4, 1993, Grace Dorris was assaulted by James Kelley, then her husband and now her ex-husband, during a hearing at the Washoe County Courthouse on her request for a permanent protective order against him. She brought this § 1983 suit against the County, its commissioners, the Sheriff and a deputy sheriff, alleging that they violated her constitutional due process rights by providing inadequate courthouse security.

In a prior order (Doc. # 11) we noted various defects in Dorris's complaint and gave her leave to file an amended complaint curing those defects. She has done so (Doc. # 12) and the case is here on the defendants' motion to dismiss. (Doc. # 14.) Dorris has opposed that motion (Doc. # 17) and the defendants have replied. (Doc. # 18.) The motion to dismiss will be **GRANTED.**

As the defendants' motion is made under Rule 12(b)(6), we consider only the amended complaint. We may, however, look to Dorris's own briefing to elucidate the complaint. The essence of her claim, in her own words, is that

> government actors violated her constitutional rights by placing her in a position of known danger, that is, in close proximity with her then husband who they knew had a history of violence against her, without adequate security, with deliberate indifference to the creation of the danger; and that they maintained policies which caused plaintiff's attack by Kelley. Plaintiff was *required* to come into the courtroom in order to obtain protection for herself and her children under [Nevada statutory law]. She had no other option but to forego the legal protection which was her right.

Doc. # 17 at 4.

Dorris was assaulted by her husband, not by the defendants. Her complaint is that the defendants, as state actors, failed to adequately protect her from her husband.

■ Members of the public generally have no constitutional right to sue state employees who fail to protect them against harm inflicted by third parties.

This general rule is modified by two exceptions: (1) the "special relationship" exception; and (2) the "danger creation" exception. Although some cases have blended the two exceptions together, the distinction is important. *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir. 1992) (citations omitted); *see also United States v. Koon,* 34 F.3d 1416, 1447 (9th Cir. 1994) (the state has a duty to protect the plaintiff from violence by third parties "not only when the victim is in custody, but also when the state has created the danger to which the victim is exposed").

### I. *Special Relationship*

The "special relationship" exception is typically thought to require custody, and has been applied where the plaintiff is a prisoner or has been involuntarily hospitalized. *Id.* In her complaint, Dorris alleges that she was harmed at a time when she was *"required* by the government to be present in a certain courtroom" in order to seek protection for herself and her children. (Doc. # 12 ¶ 41 (emphasis added).) We construe this liberally as an argument that the defendants were in a "special relationship" with Dorris because she *had* to come to a certain courtroom at a certain time in order to invoke her legal remedies against Kelley.

■ The argument is not convincing. A "special relationship" arises where the plaintiff is truly rendered helpless by her relation with the state, as in the case of prisoners and mental patients—where "[t]he state's custody" over the plaintiff "is the most distinguishing characteristic" of its relation with them. *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990); *see also Leffall v. Dallas Independent School Dist.,* 28 F.3d 521, 528 (5th Cir.1994) (collecting cases). By contrast, a state does not, for example, enter into a special relationship with students even though it *requires* them to attend school, because it does not thereby render them so helpless that "an affirmative constitutional duty to protect arises." *Id.; see also Graham v. Independent School Dist.*

*No. I–89,* 22 F.3d 991 (10th Cir.1994) (school district not liable for harm to student inflicted by private actor during school hours even where employees knew actor had threatened student and was on school grounds). Analogously, we think that a special relationship does not arise merely because a person must come to court to participate in various legal proceedings. The state may have required Dorris to appear in court, but it did not thereby assume responsibility for her "basic human needs" or "entire personal" life; she retained "substantial freedom to act." *Id.*

## II. *Danger Creation*

The "danger creation" exception made its first appearance in this circuit in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), in which a police officer arrested the driver of a car and stranded the plaintiff, who was a passenger in the car, in a high-crime area in the middle of the night; with no other means of transport, she hitched a ride with a passing motorist who raped her. The other danger creation case in this circuit is *Grubbs,* in which the plaintiff, a nurse employed at a medium security facility for young male offenders, was directed by her supervisors to work with an inmate who was known by them to be a violent sex offender likely to attack any woman with whom he was left alone; the plaintiff had been led to believe that she would not be required to work under such conditions, and was raped by the inmate. *Grubbs,* 974 F.2d at 120, 123.

We may assume, for present purposes, that the defendants did "create" a "danger" to Dorris and that a duty to protect her therefore arose.[1] The problem with Dorris's "danger creation" theory is that the defendants' actions here, taking the allegations in the complaint as true, amount at most to "mere negligence or lack of due care," which does not "trigger the protections of the fourteenth amendment and therefore does not state a claim under section 1983." *Wood,* 879 F.2d at 587 (*citing Daniels v. Williams,* 474 U.S. 327, 330–32, 106 S.Ct. 662, 664–66, 88 L.Ed.2d 662 (1986), *and Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986)). Dorris herself alleges that Kelley *was* manacled and that there *was* a bailiff, who was also a deputy sheriff, in the courtroom. She cites two primary defects in the way the defendants handled the situation: the manacle, though it bound Kelley's wrists, was not itself chained to the chain around Kelley's waist; and the bailiff "failed to position himself properly in the courtroom with respect to Kelley so as to be able to safeguard [Dorris] in the event of an attack by Kelley." Doc. # 12 ¶ 26. Kelley was therefore able to use his hands to attack Dorris, and the bailiff took longer than he or she otherwise would have to attempt to stop the attack.[2]

1. The assumption is problematic. Unlike *Wood* and *Grubbs,* in which the state's actions with respect to the plaintiff were voluntary, one could at least argue that, because Kelley was a party to the domestic violence case and presumably would have had a right to attend the hearing had he not been in custody, the state was obligated to make some provision for his participation in the hearing—by bringing him to court, as it did, or perhaps by allowing his telephonic participation.

2. Dorris makes other allegations in her complaint, but we think these add nothing. For example, she complains that Kelley was in the "wrong color uniform for a violent offender," but it is hard to see what difference that would make, unless it is that Kelley, had he been wearing the proper uniform, would have been restrained more severely. This adds nothing to Dorris's complaint, which already alleges that Kelley was not sufficiently restrained.

Dorris also alleges that the judge, for no good reason, had Kelley and her sit in proximity to one another, that the judge was not wearing a

robe, which diminished the aura of judicial authority in the courtroom, and that, when Kelley attacked Dorris, the judge left the courtroom without pushing the "panic" button. All of those are acts of a judicial officer which cannot be charged against the defendants here.

Finally, Dorris alleges that the courthouse was not equipped with security devices and that the bailiffs were not trained "in the staffing of the small domestic violence courtrooms." Doc. # 12 at ¶ 15. Had the courthouse been equipped with security devices, it would have made no difference. Kelley did not wander in off the street with a gun; he was in custody and was brought in by a deputy sheriff. And, as explained in footnote 3, *infra,* under *City of Canton* the allegation that the bailiffs were not trained sufficiently would require a showing of "deliberate indifference," which Dorris could not demonstrate even if all her factual allegations were true.

Again, we think these allegations, if true, amount at most to ordinary negligence. In *Leffall,* for example, the decedent was killed by random gunfire in the parking lot of a public high school after a school dance. The Fifth Circuit held, as a matter of law, that the defendant school officials had not acted with "deliberate indifference" where they had provided two unarmed security guards on the night in question. *Leffall,* 28 F.3d at 531. "[G]ood faith but ineffective responses," it explained, tend to defeat claims of deliber-

ate indifference. *Id.* at 532. Here, Kelley was manacled and a bailiff was present in the courtroom. We think that these efforts at security, though obviously insufficient to prevent the attack on Dorris, preclude a finding that the defendants acted with deliberate indifference.

Moreover, we assume, for present purposes, that Dorris could proceed, even absent deliberate indifference, if the defendants' actions were "grossly negligent" or "reckless."[3]

3. That is a deeply problematic assumption. We deal here with a narrow range of cases, in which the plaintiff is harmed by a *third party,* and brings a § 1983 substantive due process claim, seeking to hold the state liable for "failing to protect" her from the third party.

The question is this: what mental state is necessary in these "due process third party harm" cases before the defendants can be held liable? The Ninth Circuit cases in this area are an impenetrable muddle. In *Wood* and *Grubbs,* the two "danger creation" cases in this circuit, the court avoided the question, holding that the plaintiff had raised a triable question of deliberate indifference, so it was not necessary to decide whether a less culpable mental state would support liability. *Wood,* 879 F.2d at 591–92; *Grubbs,* 974 F.2d at 122–23 ("[n]either the Supreme Court nor this court has stated what mental state beyond 'mere negligence' is required for due process third party harm claims").

We note, first, some problems with the terminology. The spectrum seems to run as follows: negligence, gross negligence, recklessness, and deliberate indifference. *See Wood,* 879 F.2d at 588 n. 4; *Redman v. County of San Diego,* 942 F.2d 1435, 1445 n. 13 (9th Cir.1991). It is unclear, however, that there is any difference, for example, between "deliberate indifference" and "recklessness," at least as our court of appeals has elaborated those terms. *See Redman,* 942 F.2d at 1445 n. 13 (either will "suffice to establish liability under section 1983, since 'reckless' means 'wanton' and is equivalent to a deliberate choice"); *but see id.* at 1440 n. 6 (the case did not present the question whether "recklessness" could give rise to a due process violation); *but see id.* at 1443 ("reckless indifference" will suffice to establish liability). It is similarly unclear whether "gross negligence" differs from "deliberate indifference" or "recklessness." *See Neely v. Feinstein,* 50 F.3d 1502, 1507 (9th Cir.1995) ("[m]ental hospital officials are liable if they exhibit *'conscious indifference amounting to gross negligence'*"; following the Supreme Court's *Youngberg* [*v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28] [(1982)] definition of "gross negligence") (emphasis added); *see also Simescu v. Emmet County Dep't of Social Services,* 942 F.2d 372, 375 (6th Cir.1991) (gross negligence sufficient for substantive due process claim, *where it is defined* as defendant "intention-

ally do[ing] something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow"); *cf.* Barbara Kritchevsky, *Making Sense of State of Mind: Determining Responsibility in Section 1983 Municipal Liability Litigation,* 60 Geo.Wash.L.Rev. 417, 470 n. 279 (1992) ("there appears to be no discernible difference between indifference, recklessness, wantonness, and willfulness"). There are numerous cases from other circuits, which we do not attempt to survey. In any event, Ninth Circuit precedent suggests that we must employ the traditional labels. *See Fargo v. City of San Juan Bautista,* 857 F.2d 638, 643 n. 8 (9th Cir.1988).

The second, more important difficulty is this: it is unclear what state of mind, other than deliberate indifference, will support liability. Again, we know that ordinary negligence is never sufficient for liability on a § 1983 substantive due process claim, and that deliberate indifference will suffice—but what about "gross negligence" and "recklessness"? *Wood* and *Grubbs,* as noted above, tell us only that deliberate indifference will do.

We turn, then, to *Redman,* which, like this case, involved a failure by state officials to prevent an attack on the plaintiff by a third party. (They could have had a duty to do so only because Redman, a pretrial detainee, was in custody and therefore a "special relationship" arose. But we see no reason why "special relationship" and "danger creation" cases should require different states of mind to support liability; the two categories are closely related.)

In *Redman,* the Ninth Circuit held that the plaintiff, to prevail, had to establish "deliberate indifference." The term was defined as follows: a guard or official acted with "deliberate indifference" if he had "more than a suspicion that an attack would occur" and failed to prevent it, even if he did not "believe to a moral certainty" that one inmate intended to attack another at a given time and place. The definition is so cryptic as to be useless to trial courts, let alone to juries: the only thing it tells us clearly is that "deliberate indifference" is something more than negligence.

The circuit also held, in the alternative, that "reckless indifference" would support liability. It defined "reckless indifference" as

conduct that is so wanton or reckless with respect to the 'unjustified infliction of harm as is tantamount to a knowing willingness that it occur' will also suffice to establish liability because it is conduct equivalent to a 'deliberate choice.'

*Redman,* 942 F.2d at 1442–43. The court declined, *id.* at 1440 n. 6, to decide whether "gross negligence" or "recklessness" would give rise to a due process violation outside the "jail or prison" context. It also failed to explain how "reckless indifference" relates to "deliberate indifference" and "recklessness," an omission especially troubling in light of its suggestion that the latter two terms are themselves equivalent. *Id.* at 1443 n. 10, 1445 n. 13.

In a key footnote, the *Redman* court noted that its opinion applied only in the "jail or prison" context. *Id.* at 1440 n. 6. It noted that under the circuit's earlier decision in *Fargo v. City of San Juan Bautista,* 857 F.2d 638 (9th Cir.1988), a police officer could be held liable under § 1983 for accidentally shooting an unarmed, handcuffed arrestee, lying motionless and face down on the ground, if the officer was grossly negligent or reckless. In other words, *Redman* cites *Fargo* for the proposition that "recklessness" or "gross negligence" will generally support liability, except in the "jail or prison" context, such as that presented in *Redman* itself, in which only "deliberate indifference" or "reckless indifference" will suffice. (Presumably that is because, although the "special relationship" imposes upon the state a duty to protect detainees from harm by third-parties, concerns "for institutional safety and control," *id.* at 1442, require that the duty, having been imposed, be limited. In a "riot situation," for instance, the state is liable for harm inflicted by prison guards only when they act with at least "malicious indifference." *Id.* at 1441–42. Of course, in that situation the harm is done by the guards, so what is involved is affirmative conduct by the state, not a failure to protect from harm done by a third party.)

*Redman*'s reference to *Fargo* is baffling, for several reasons. First, in *Fargo,* a "special relationship" may well have arisen when the victim was handcuffed and thus at the mercy of the police officer. But the harm in *Fargo* was inflicted *by a police officer,* i.e., by a state actor. Whether the state was in a "special relationship" with the plaintiff, and therefore had to protect him from third parties, was thus irrelevant. In other words, it is unclear what *Fargo* has to do with a case, such as *Redman,* involving state liability for harm inflicted by private *third parties.* Indeed, the *Fargo* court itself distinguished, as involving "a failure to act, rather than affirmative official misconduct," *Fargo,* 857 F.2d at 641 n. 3, both *Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988) (Easterbrook, J.) (gross negligence does not violate due process; fire department dispatcher's failure to send requested rescue services, and provision of incompetent medical advice, for woman who later

died); *but see id.* at 1225 (Posner, J., concurring) (the negligent advice could have caused the woman's death), and *Washington v. District of Columbia,* 802 F.2d 1478 (D.C.Cir.1986) (reckless failure to act insufficient for § 1983 liability; plaintiff prison guard, attacked by an inmate, sued officials for "reckless failure" to "remedy unsafe conditions" at the prison).

Second, one might attempt to explain the reference to *Fargo* by noting that one claim in that case was against the city itself, which the plaintiff sought to hold liable for the harm done by its police officer. In a sense, then, one could argue that the plaintiff did seek to hold the city liable for the acts of a "third party." Not so. A case based on a defendant's failure to protect a plaintiff against harm done by a private party (who is not a state actor) just isn't the same thing as a case where the harm *is* done by a state actor (e.g., a police officer), and the plaintiff seeks to hold that actor's employer (e.g., a city) liable for its "failure to train" the employee. *Fargo* fell within the latter category. *See* 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3.14, at 209–10 (3d ed. 1991 & Supp.1994). Indeed, a "failure to train" case clearly requires "deliberate indifference." *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Third, the *Wood* court noted in 1989 that while earlier Ninth Circuit decisions—*Fargo* and *Wood v. Ostrander,* 851 F.2d 1212 (9th Cir.1988) (an earlier opinion in the same case)—had suggested that "gross negligence" would support a due process claim, those cases had been called into question by the *City of Canton* decision. It is unclear, then, why the *Redman* court would cite *Fargo* with approval two years later. The answer may be that the *Wood* court apparently viewed *Fargo* as a "failure to train" case, and therefore correctly viewed *Fargo*'s holding as dubious in light of *City of Canton,* while the *Redman* court, by contrast, may have viewed *Fargo* as involving a "special relationship" and therefore viewed gross negligence or recklessness as sufficient since, unlike *Redman* itself, *Fargo* did not arise in the "jail or prison" context. For the reasons set out above, the *Wood* court's approach obviously makes far more sense: *Fargo,* to reiterate, involved harm done directly by the police officer, and the claim against the city (the officer's employer) was a "failure to train" claim, *Fargo,* 857 F.2d at 643; it was not a "third party harm" case and would thus seem of limited relevance, if any, to *Redman.*

Two recent cases add little to the analysis. In *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir.1995), the court noted that gross negligence or recklessness can be actionable under § 1983. In *Fuller,* however, substantive due process was not at issue. The constitutional right allegedly violated was that of equal protection, and neither *Fuller* nor *Hammond v. County of Madera,* 859 F.2d 797 (9th Cir.1988), the case it cited, involved third party harm. In *Neely v. Feinstein,* 50 F.3d 1502, 1507 (9th Cir.1995), the court—

That makes no difference to this case, because, as noted above, we think the defendants' actions here amount at most to "ordinary negligence." The case is analogous to *Salas v. Carpenter,* 980 F.2d 299 (5th Cir. 1992), in which the decedent was taken hostage in a county courthouse. The city's SWAT and hostage negotiation teams were dispatched, but were later called off by the county sheriff, who claimed that courthouse security was within his exclusive jurisdiction and brought in his own personnel. The sheriff's department did not have a SWAT team and had no personnel with any real experience in hostage negotiations. The hostage was killed by her captor. *Salas* matters here because of the Fifth Circuit's holding that

the sheriff's "failed rescue effort" amounted to no more than negligence. *Salas,* 980 F.2d at 308–09.

■ Also on point is *Johnson v. Dallas Independent School Dist.,* 38 F.3d 198 (5th Cir.1994), in which a student was killed in a high school hallway by a stray bullet fired during a melee instigated by a non-student. The court noted various deficiencies in the plaintiff's constitutional claim. For our purposes, the key to the opinion is that there was

no suggestion that the school district or [school] principal fostered or tolerated anarchy at Smith High—the ID badges and

---

citing *Fargo* and the first *Wood* opinion, both of which it has questioned in the past—held that "[m]ental hospital officials are liable if they exhibit 'conscious indifference amounting to gross negligence.'" *Neely,* however, involved harm inflicted on a mental patient by a hospital employee, and the suit was about the failure of the employee's supervisor to prevent the attack. Thus, rather than involving harm inflicted by a private third party, it falls within the line of cases starting with *Youngberg* relating specifically to the duties of officials with responsibility for mental patients.

In short, neither *Fargo, Fuller,* nor *Neely* is of much use here. *Wood, Grubbs* and *Redman* tell us that "deliberate indifference" and "reckless indifference" are adequate. As noted at length above, *Redman* also creates a semantic jumble, telling us that "recklessness" was not at issue (but that it is the same thing as a "deliberate choice") and creating the apparently intermediate state of mind called "reckless indifference." Clearly, tossing an extra adjective into the mix clarifies nothing.

It may be that the objective has been to ensure that, though negligence will not suffice, defendants *can* be found liable even if they did not specifically intend that the plaintiff be harmed, and *can* be found liable though they were not subjectively (i.e., actually) aware of the risk of harm. *See Neely,* 50 F.3d at 1507. If that is so, then perhaps the answer is not to play with labels, but to write a clear definition. For example, such a definition might allow a finding of liability if, among other things, the defendant *either* (1) actually knew of the risk of harm (this corresponds to "deliberate indifference") *or* (2) actually knew of facts which *clearly* would lead *any* reasonable person to conclude that there was a risk of harm, but did not draw that conclusion himself (this certainly amounts to "recklessness," and probably to "gross negligence" too, if the latter is defined, as it was in *Neely,* to include "conscious indifference"). Such a formulation would allow liability even where the defendant

did not specifically intend the harm and, moreover, was not "subjectively aware," as the *Neely* court put it, of the risk of harm.

We think that "deliberate indifference" or "reckless indifference" or "recklessness" will suffice, and that "gross negligence" will not. We reach that conclusion about "gross negligence" for the following reasons. One is "negligent" if one does not take precautions where the expected benefits exceed the cost of the precautions, and "grossly negligent" if one does the same where those benefits substantially exceed the cost of the precautions. The line between the terms is "indistinct and unusually invisible," and a "line that cannot be policed is not a line worth drawing in constitutional law." *Archie,* 847 F.2d at 1219; *see also id.* at 1226 (the distinction between the terms has "largely been discarded in tort law, as unworkable") (Posner, J., concurring). And even if the line could be drawn, it should not be: the Due Process Clause "is designed to control abuses of government power, and on that account does not reach negligence but does proscribe intentional deprivations. 'Recklessness' is a proxy for intent; 'gross negligence' is not." *Id.* at 1220. Of course, "gross negligence" will support liability if it is defined, as the Supreme Court and the Ninth Circuit have defined it, as involving "conscious indifference." In that case, however, only the label "gross negligence" remains, for "*conscious* indifference" involves at least imputed intent and thus amounts, in substance, to recklessness—i.e., to a lower level of intent, not a higher level of negligence.

In any event, we need not parse the fine distinctions between "deliberate indifference," "reckless indifference," "recklessness," "gross negligence," and "negligence." As noted in the text of this order, we assume that "recklessness" and even "gross negligence" would support liability here. Because the defendants' alleged behavior in this case amounted to nothing worse than ordinary negligence, they cannot be held liable.

metal detectors permit the opposite inference. *Even if the deployment of such security measures was haphazard or negligent,* it may not be inferred that the conduct of the defendants rose to the level of deliberate indifference. As in *Leffall,* *the most that may be said of defendants' ultimately ineffective attempts to secure the environment is that they were negligent,* but not that they were deliberately indifferent.

*Johnson,* 38 F.3d at 202. So too here. The failure to chain Kelley's wrists to his waist, and the failure to have the bailiff sit closer to the parties, were at worst negligent. We think that, as a matter of law, they were not grossly negligent or reckless. The defendants here took precautions, which were ineffective, to secure the courtroom environment. They did not, according to Dorris's own complaint, exhibit "conscious indifference" amounting to "gross negligence," *Neely,* 50 F.3d at 1507; *a fortiori* the alleged failures were not so "wanton" that they amounted to a "deliberate choice," in the words of the *Redman* court.

Because Dorris has alleged conduct by the defendants which, if the allegations are true, would amount at worst to simple negligence on their part, and because negligence will not support a constitutional § 1983 claim, the defendants' motion will be granted.

**IT IS THEREFORE HEREBY ORDERED** that defendants' motion (Doc. # 14) to dismiss is **GRANTED.**

The clerk shall enter judgment accordingly.