BYBEE, Circuit Judge,
concurring in part and dissenting in part:
In Youngberg v. Borneo, the Supreme Court held that those involuntarily committed in state-run mental hospitals have “rights ... to reasonable conditions of safety.” 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Recognizing that “an institution cannot protect its residents from all danger of violence,” the Court found that “the Constitution only requires that the courts make certain that professional judgment in fact was exercised.” Id. at 320-21, 102 S.Ct. 2452 (citation and quotation marks omitted). Despite the Court’s instruction that “[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made,” id. at 321, 102 S.Ct. 2452, the majority embarks on precisely this quest, defining a new code of conduct for mental health hospital administrators and casting “professional personnel ... [into] the shadow of an action for damages,” id. at 325, 102 S.Ct. 2452.
Not only does the majority author a code of model professional conduct, it finds *1037 its code to be both constitutionally compelled and clearly established. Indeed, under the majority’s code:
• “[a] reasonable administrator [must] ... take [resident] allegation^] into account when assigning and supervising staff members in cottages where female patients residef],” even when those allegations have been investigated and determined to be “unfounded,” Maj. Op. at 1032-33;
• administrators must personally undertake “a basic review of [patients’] fíle[s]” and monitor patients’ bedroom decorations on “walk[s] through the [hospital] facility,” to catch signs of burgeoning and illicit relationships between patients and staff, id. at 1033— 34; and
• administrators will be held strictly liable for any harm caused in part by their employees’ failures to communicate with them, including a failure to make administrators aware of “specific concerns voiced by parents,” id. at 1032-34 (“[A] reasonable hospital administrator ... would have taken steps to ensure that the staff ... brought [warning] signs to the administrator’s attention so that she could take the necessary steps to prevent [an employee] from abusing his position.” (emphasis added)).
These new mandates are unjust, unfounded, and unworkable. None is required by the Constitution or established by our cases. For these reasons, I respectfully dissent as to LaFond.[1]
I
Let’s be clear — neither the majority nor the appellee claims that LaFond was personally aware of an inappropriate relationship between Grant and Ammons. In fact, it is undisputed that LaFond did not have subjective knowledge of Grant’s improper attentions to Ammons. Therefore La-Fond’s liability — in fact, the court’s ability to entertain a § 1983 suit against her— only exists if she can be held responsible for the allegedly unconstitutional actions of her subordinates.
A
Fundamental to the principle of qualified immunity is the notion that an individual will not be held constitutionally liable— cannot even be subject to suit — for anything but his oum actions that are in violation of clearly established constitutional law. This is because § 1983 liability cannot be established solely on a theory of respondeat superior. As the Supreme Court recently reminded us: “vicarious liability is inapplicable to ... § 1983 suits”; “[i]n a § 1983 suit ... masters do not answer for the torts of their servants”; and “[a]bsent vicarious liability, each Government official ... is only liable for his or her own misconduct.” Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1948-49, 173 L.Ed.2d 868 (2009). We have long held the same. See, e.g., Preschooler II v. Clark County Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir.2007); Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989).
The standard necessary to establish a § 1983 violation by a supervisor is no different than the standard necessary to establish a § 1983 violation by any other government official: “a plaintiff must plead that each Government-official defendant, through the official’s oum individual actions, has violated the Constitution.” Iqbal, 129 S.Ct. at 1948 (emphasis added). *1038 For instance, in Iqbal, the Supreme Court held that it was insufficient for the plaintiff to allege that the supervisor defendant had “mere knowledge of his subordinate’s discriminatory purpose]!]” Id. at 1949. As the Court explained: “In the context of determining whether there is a violation of clearly established right [sic] to overcome qualified immunity, purpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.” Id.
In this case, the constitutional provision at issue is the Due Process Clause of the Fourteenth Amendment. The Supreme Court first articulated the standard for proving violations of the involuntarily committed’s rights to bodily safety in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Court found that those involuntarily committed in state-run mental hospitals have “rights ... to reasonable conditions of safety” but that, to respect those rights, the mental hospital employees need only exercise “professional judgment.” Id. at 321, 102 S.Ct. 2452. The Court said: “[Liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.” Id. at 323, 102 S.Ct. 2452. In other words, “[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised.” Id. at 321, 102 S.Ct. 2452 (citation omitted). For this reason, the Youngberg professional judgment standard is less a “professional judgment” standard than it is an “any professional judgment” standard because exercising any professional judgment will shield a state hospital professional from § 1983 liability.
The Supreme Court emphasized the latitude that must be allowed to mental health professionals under the Fourteenth Amendment by explaining that the Young-berg professional judgment standard is not an opportunity for lower courts to play Monday morning quarterback: “It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.” Id. To ensure that courts would not use the Youngberg professional judgment standard to categorize as constitutional violations any professional decision with which they did not agree, the Court established a presumption in favor of the professionals: “[D]ecisions made by the appropriate professional are entitled to a presumption of correctness.” Id. at 324, 102 S.Ct. 2452. The Court explained that a mental health professional deserves this favorable presumption because, acting alone, she “may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages.” Id. at 324-25, 102 S.Ct. 2452 (emphasis added). The Court clearly did not want state mental health professionals to act in fear of the lay judgment — pronounced with great certainty and with all the clarity that hindsight affords — of the courts. See Ashcroft v. al-Kidd, 563 U.S. -, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (“Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.”). Hence a professional judgment standard.
B
Applying Iqbal to Youngberg, it is clear that Ammons cannot establish that La-Fond violated her constitutional rights. *1039 For constitutional purposes, “decisions made by [LaFond] are entitled to a presumption of correctness.” Youngberg, 457 U.S. at 324, 102 S.Ct. 2452. In order to state a cause of action, Ammons must allege sufficient facts that LaFond’s own actions toward Ammons were [‘such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [LaFond] actually did not base[her] decision[s] on such a judgment.” Id. at 323, 102 S.Ct. 2452. She has failed to do so. In an absence of sufficient evidence, we do not leave it to a jury to offer its own opinion of the administration of the institution — we find that LaFond wins.
The majority too recites these standards, but it does not believe them. It gives lipserviee to the professional standards component of Youngberg but then rests its decision entirely on its own nonprofessional judgment. The majority dutifully states that “the judgment of professionals must not depart substantially from ‘accepted professional judgment, practice, or standards,’ ” Maj. Op. at 1027-28 n. 5 (quoting Youngberg, 457 U.S. at 323, 102 S.Ct. 2452).[2] But we will scour the majority opinion in vain for any evidence of what constitutes “accepted professional judgment, practice, or standards” in the administration of a residential mental health facility for youths. There is no evidence that the majority has considered or read any such standards. Instead, the majority has simply made them up.[3] The majority has mistaken its own ipse dixit for the judgment of mental health professionals.[4]
Even if LaFond violated Ammons’s constitutional right to Fourteenth Amendment substantive due process, she cannot be subject to suit for that violation unless the “state of the law in [2003] gave [LaFond] fair warning that [her] alleged treatment of [Ammons] was unconstitutional.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). If the majority cannot even identify the professional standards for judging LaFond’s decisions, how can we begin to think that the law was so “beyond debate” that LaFond “would have understood that what [s]he is doing violates that [law]”? al-Kidd, 563 U.S. at -, 131 S.Ct. at 2083 (internal quotation and citation omitted). As I explain in the *1040 following sections, it is anything but clear that LaFond’s decisions violated established law.
II
I observe first that it is difficult to apply the Youngberg professional judgment standard to LaFond’s actions towards Ammons because, according to the record, apart from making general decisions about the facility in which Ammons (and others) lived, LaFond did not take any actions concerning Ammons. Therefore, to find LaFond eligible for suit for violating Ammons’ constitutional rights, we have to find that LaFond’s inactions toward Ammons were unconstitutional.
Not knowing exactly how to begin analyzing the constitutionality of an infinite list of LaFond’s inactions towards Ammons, I turn to the majority opinion.[5] Sifting through its analysis, it becomes clear that the majority identified three of LaFond’s inactions as unconstitutional: (1) LaFond failed to “take[ ] ... into account” the past allegations against Grant when she “assign[ed] and supervised] staff members,” Maj. Op. at 1032; (2) LaFond failed to personally review each patient’s file, in an effort to “become aware of the escalating impropriety between” employees and patients, id.; and (3) LaFond failed to ensure that she was informed “of specific concerns voiced by parents,” id. at 1033. These “failures” deserve close inspection, both because LaFond will now have to endure the personal and financial costs of a trial because of them and because they are now statements of constitutional law, applicable to all mental health administrators in the Ninth Circuit.[6] I discuss each failing in turn.
A
The majority identifies LaFond’s disregard of the past allegations against Grant as her first constitutional failure. As the majority explains, “LaFond was aware that Grant previously had been accused of sexually molesting a minor female patient. ... A reasonable administrator, exercising professional judgment with respect to providing safe conditions, would have taken Resident A’s allegation into account when assigning and supervising staff members in cottages where female patients resided.” Maj. Op. at 1032 (emphasis added).
*1041 First, let me point out that this is an incorrect application of the Youngberg professional judgment standard. If the majority had been properly applying the professional judgment standard, the majority would have asked if LaFond’s decision to make employment assignments irrespective of allegations that, two years earlier, had been determined to be unfounded was a decision based on her professional judgment. Youngberg, 457 U.S. at 321, 102 S.Ct. 2452 (“[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised.” (citation omitted)). In the absence of clear contrary evidence, the majority should have held that LaFond’s decision not to indefinitely consider the unfounded allegations against Grant was “presumptively valid.” Id. at 323, 102 S.Ct. 2452.
The majority did neither of these things. Instead, the majority concluded that “any reasonable administrator” would have considered the unfounded allegations against Grant — or any unfounded but serious allegations made against any employee — in perpetuity. I couldn’t disagree more. It is not at all clear to me that “any reasonable administrator” would — or should — • take into account allegations against an employee when making assignments concerning that employee, especially when those allegations are “unfounded.” Nor is it clear that an administrator even could make decisions about an employee based on unfounded allegations against that employee.
In this case, LaFond handled the first set of allegations against Grant exactly as she was required to do. Washington State law requires that “any ... employee of the department [of social and health services] ... [who] has reasonable cause to believe that a child has suffered abuse ... shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department [of social and health services].” Wash. Rev.Code 26.44.030(l)(a) (emphasis added). As the CEO of the Child Study and Treatment Center (“CSTC”), LaFond was an employee of the Washington State Department of Social and Health Services (“DSHS”), and she was responsible for other employees under the same obligation. When Resident A came forward with allegations that Grant had sexually abused her, her allegations were promptly reported to Child Protective Services (“CPS”), as is required by Wash. Rev.Code 26.44.030(l)(a). At that point, CPS conducted its own investigation, during which time, LaFond ordered that Grant not have contact with female residents. LaFond did not interfere with the investigation, but let CPS interview the victim, witnesses, and the victim’s psychologist. After those interviews, LaFond was told by Resident A’s treating psychologist that she had recanted her allegations against Grant, and LaFond passed that information on to CPS. Notably, CPS did not immediately close its investigation; instead, it interviewed Grant. Only then did it close the investigation and conclude that the allegations were “unfounded” because “it would have been extremely unlikely that they could have occurred as stated.”[7]
Once CPS closed its investigation and formally cleared Grant, LaFond did not *1042 consider Resident A’s unfounded allegations in making employment decisions about Grant. Although this is beside the point — because the Youngberg standard does not call for a reasonableness analysis — this seems reasonable to me. La-Fond was not required to continue to consider the unfounded allegations against Grant by any Washington state law, regulation, or procedure. I can’t see why La-Fond is liable under the Due Process Clause of the Fourteenth Amendment for acting consistently with state law. See Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir.1994).
Nor, in fact, might LaFond have been allowed to consider unfounded allegations against Grant, as doing so might have violated Washington State’s complicated government employment scheme, which includes at least (1) a Fourteenth Amendment due process property right in some civil service employment and the attendant constitutional protections, see Fuller v. Employment Sec. Dep’t of the State of Wash., 52 Wash.App. 603, 762 P.2d 367 (1988); (2) a statute requiring the destruction of “information relating to employee misconduct or alleged misconduct” in situations where “such information [was] determined to be false” or “where the employee has been fully exonerated of wrongdoing,” Wash. Rev.Code 41.06.450(l)(a); and (3) collective bargaining agreements that may place limits on CSTC administrators’ ability to discipline psychiatric child care counselors. If the majority is correct, the Due Process Clause required LaFond to do what she was forbidden to do by Washington law.[8]
We on the Ninth Circuit are well aware of the perils and heartache that can come when' individuals are dogged by accusations from which they have been cleared. In Humphries v. County of Los Angeles, 554 F.3d 1170 (9th Cir.2009), reversed in part on other grounds by — U.S. -, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), we recognized that this kind of unshakable pursuit by past false accusations can be a “nightmare.” Id. at 1180. The facts of Humphries bring this nightmare to life. The Humphries were parents falsely accused of abuse by a rebellious child, triggering their arrests and the removal of their remaining children. Id. at 1175. After the state dismissed the criminal case against them, the Humphries petitioned for further relief, and the criminal court found them “factually innocent” of the charges and ordered the arrest records sealed and destroyed. Id. The juvenile court likewise dismissed as “not true” all counts of the dependency petition against them. Id. The Humphries thought they’d been cleared. But despite their efforts, and pursuant to state law, their names were listed in a state database of “known or suspected child abusers,” which a wide variety of organizations — including government agencies, employers, law enforcement entities, and other public and private groups — either had access to or, in some cases, were required to consult. Id. at 1175-76 (emphasis added). The Humphries tried to have their names removed from the database, but no such procedure *1043 existed in California, so they sued in the federal courts, claiming that maintenance of the state database violated the Due Process Clause of the Fourteenth Amendment because “identified individuals are not given a fair opportunity to challenge the allegations against them.” Id. at 1176. We held that they were right — their inability to challenge their listing in the database “violatefd] the[ir] procedural due process rights,” id. at 1202, in part because “there is a great human cost ... to being falsely accused of being a child abuser,” which should prompt us to “protect[ ] ... citizens against such calumny” “with the same passion that [we] condemn[] the child abuser for his atrocious acts,” id. at 1194.
In light of our decision in Humphries, it is more than ironic — it is plainly inconsistent — that we would hold that the Due Process Clause requires that state hospital administrators do what we have previously held the Due Process Clause prohibits state actors from doing. Compare id. at 1193 (“the Humphries have an interest in not being stigmatized ... if they have not committed the acts underlying the reports .... [T]hey have an interest in pursuing employment ... and securing the appropriate licenses for working with children without having to be subject to an additional investigation, delays, and possible denial of a benefit....”) with Maj. Op. at 1032 (“While LaFond had no cause to discipline Grant, because he had been exonerated of the molestation charge, she certainly had reason, in light of her duties with respect to the safety of her patients, to manage and monitor his duties more carefully.” (emphases added)); id. n. 13 (“We fully acknowledge that Grant was exonerated as an official matter ... [but] a reasonable hospital administrator ... would have done more to protect vulnerable female patients.”).[9] Viewed in this light, the majority opinion, which mandates that state hospital administrators always remember and never forget even unfounded allegations against hospital employees, is not only unreasonable, it is manifestly unjust and inconsistent with our decision in Humphries.[10]
B
According to the majority, LaFond’s second unconstitutional inaction was her failure to “take[] steps to become aware of’ the signs of Grant’s inappropriate attentions to Ammons “through a basic review of Ammons’s file or by simply walking through the facility.” Maj. Op. at 1033. In so holding, the majority again erred by not applying Youngberg’s professional judgment standard or the Young-berg presumption in favor of LaFond.
Instead, the majority pulled this constitutional responsibility out of its hat. How *1044 can it say, without precedent or evidence or expert testimony or support of any kind, that the Constitution requires that LaFond have looked personally at Ammons’s file? Or personally walk through the cottage into Ammons’s room to observe her wall decorations? Notably, the majority does not cite to any case, statute, DSHS regulation, CSTC policy or custom, or industry expectation that LaFond personally review patient files or monitor patient room decor. Nor does the majority explain how, in the future, mental health administrators should know which patients’ files they are constitutionally compelled to review personally or which halls the Fourteenth Amendment requires them to walk. Such vigilance might be routine protocol in one facility, extraordinarily conscientious administration in another facility, and simply impracticable in yet a different facility. Nothing in Youngberg tells us how to make such choices, only that administrators must be presumed to have made a professional judgment, and they are liable only if they exercise no judgment at all. Youngberg does not appoint us to serve as the Board of Supervisors for Washington’s mental health facilities, with the power to hire, fire, promote, or discipline its administrators. Yet the majority’s new standard would empower us to evaluate — in extraordinary detail and post hoc — the performance of such administrators, all in the name of the Due Process Clause.[11]
This case demonstrates the complexity of the majority’s new code of professional conduct. As the majority notes, CSTC is a “small” community, see Maj. Op. at 1032, housing a maximum of sixty-four residents, but to serve these residents, CSTC has a complicated and multilayered organizational structure. Although the record does not contain a complete account of CSTC’s chain of command, we do have a glimpse of what practically it would mean for LaFond to be required to personally monitor and supervise each staff member and patient. CSTC contains three cottages; each cottage has at least one supervisor, one registered nurse, one psychiatric social worker, and one psychologist. Each cottage is divided into four “pods”; each pod has at least one residential counselor on staff twenty-four hours a day and recreation therapy staff on site during daytime and early evening hours. As far as we know, this makes LaFond ultimately responsible for at least thirteen supervisors — four at each of three cottages and CSTC’s director of nursing — and approximately thirty-six residential counselors.
According to the cottage psychologist supervising Ammons’s care, this staffing *1045 structure meant that any patient-related concerns would be reported by the residential counselors to the cottage supervisor, “up through the chain of command” to CSTC’s director of nursing, and then to LaFond, making LaFond three levels removed from the supervision of Grant, a residential counselor, and four levels removed from the direct care of Ammons.
The majority’s failure to acknowledge the organizational complexity at a “small” institution like CSTC is just one indication that it has not thought through the impracticable and burdensome implications its holding will have for the heads of state-run mental health hospitals, including ones possibly larger than CSTC. See Youngberg, 457 U.S. at 322-23, 102 S.Ct. 2452 (“there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions”). We have no business prescribing managerial behavior for mental institutions. Clearly, the majority is out of its depth and wrong in so doing.
C
The third of LaFond’s so-called constitutional errors was her failure to ensure that her employees did their jobs. The majority casts this failure in two ways: (1) “a reasonable hospital administrator, exercising professional judgment, would have taken steps to ensure that the staff who worked closely with Grant appreciated the seriousness of the situation and brought these signs to her attention so that she could take the necessary steps to prevent Grant from abusing his position,” Maj. Op. at 1033; and (2) “LaFond should have at least taken steps to ensure that she was informed of specific concerns voiced by parents such as [Ammons’s foster mother] so that she could look into the matter further,” id. at 1033. I am not even sure how to respond to such ad hoc constitutional pronouncements.
The majority neither suggests nor cites to anything in the record that indicates what LaFond should have done to “ensure” that her subordinates reported more faithfully to her. Certainly if LaFond’s subordinates had concerns that Ammons was being abused, as employees of DSHS, they, like she, were under a statutory obligation to report that abuse to the proper authority, which may have been LaFond, CPS, or law enforcement, or all three. See Wash. Rev.Code 26.44.030(l)(a). Their failures to apprise LaFond of whatever warning signs may have been visible to them were their own failures and not La-Fond’s.
Further, contrary to the majority’s assertion, there is no indication in the record that LaFond did not “take[ ] steps to ensure that she was informed of specific concerns voiced by parents.” Maj. Op. at 1033. The record does not include a comprehensive account of what instruction or training LaFond offered to her employees. We know that, according to LaFond, “[i]t was [her] practice, whenever an allegation of abuse was made which was determined to be unfounded, that [she] would direct supervisors to educate and counsel staff about any high risk behavior on their part, and watch the person accused closely for a period of time.” In the context of this practice, it is meaningful, then, that “[n]othing negative was ever reported to [LaFond] concerning Mr. Grant after [the first] incident was investigated.”[12]
*1046 Without any evidence that LaFond ignored her subordinates’ warnings or that she did not exercise professional judgment in her supervision of her employees, La-Fond cannot be held constitutionally liable for her subordinates’ failures.[13] The majority’s contrary holding amounts to constitutional Lability based on respondeat superior, and we know that § 1988 liability cannot rest on respondeat superior. See Iqbal, 129 S.Ct. at 1948; Preschooler II, 479 F.3d at 1183. At least, it couldn’t before today.
Ill
I strongly disagree with the majority that LaFond’s inactions violated Ammons’s constitutional rights, but I absolutely disagree that it was so obvious to LaFond that she was violating the Constitution by not doing what she was not doing. See al-Kidd, 131 S.Ct. at 2083 (the contours of the constitutional right at issue must be “sufficiently clear that every reasonable official would have understood that what he is doing violates that right”) (citation and quotations omitted) (emphasis added). As discussed above, it is not clear to me even now that LaFond violated the Constitution. How then was she supposed to have known that she was violating the Constitution? Certainly not by reading Youngberg. LaFond is thus entitled to qualified immunity.
For the majority, Neely v. Feinstein, 50 F.3d 1502 (9th Cir.1995), is the answer: “Youngberg and Neely serve as pre-existing, clearly established law as to what conduct supports infringement of the Fourteenth Amendment rights of involuntarily committed hospital patients.” Maj. Op. at 1030-31. In other words, because of Neely, it should have been clear to LaFond that she “violated the Constitution if [she] ran afoul of the objective Young-berg professional judgment standard as applied in Neely.” Id. at 1031.
But Neely is anything but clear. In Neely, we addressed the question of qualified immunity for four employees of a state-run psychiatric center: Stephen Feinstein, the hospital superintendent; Linda Murgo, the chair of a staff committee convened to investigate the charges of abuse by Jess Terry, an employee, against Cathy Neely, a patient; Cecilia Hosley, the hospital’s director of nursing; and John Brown, a building supervisor, responsible for assigning staff to the various hospital wards. All of these defendants were supervisors over Terry, and each of these defendants was either aware of the previous allegations against Terry or aware of the restrictions against him working one-on-one with female patients. Despite these similarities, we found qualified immunity for all of the defendants but Feinstein. We found qualified immunity for Murgo because her investigation of Terry comported with the hospital’s regulations. Id. at 1511. We found qualified immunity for Director Hosley because the record did not indicate that her actions — her failure to put in writing the restrictions on Terry and her decision to replace the absolute restriction against Terry working with fe *1047 male patients with a restriction against him working with them one-on-one — were violations of a “strong directive” from her superiors. Id. And we found qualified immunity for Supervisor Brown because, despite his decision to assign Terry to work with females when previously he’d been prevented from doing so, “we [could not] say that he acted unreasonably when faced with a staff shortage.” Id. But for Feinstein, we did not find qualified immunity because “a reasonable hospital official would have done much more to eliminate the risk that Terry would sexually abuse female patients under the hospital’s care.” Id. at 1509.
These discursive and contradictory analyses are more than “complex,” Maj. Op. at 1031 n. 11; they do not make sense. What cleared three of the defendants from liability — compliance with hospital regulations, compliance with superior directives (if any), and reasonableness in light of practicalities — could have cleared Feinstein, if we had but analyzed his actions with those standards of scrutiny. There is no indication that any of Feinstein’s actions were violations of hospital regulations or that his decision to reprimand Terry, once cleared, but to not do “much more” was not reasonable in light of hospital practicalities.[14] Yet Feinstein was subject to suit and liability, and the other supervisors were not. Even if she had read Neely, LaFond would not have clearly known that she could be liable like Feinstein and not protected by qualified immunity as were Murgo, Hosley, and Brown.
And even within the Feinstein-related analysis, our legal standards contradict. In determining the question of Feinstein’s qualified immunity, we simultaneously applied three different standards to the question of hospital administrator liability: the Youngberg professional judgment standard and a “conscious indifference amounting to gross negligence” standard and an objective “deliberate indifference.” We did this by importing the “conscious indifference” standard from Estate of Conners by Meredith v. O’Connor, 846 F.2d 1205, 1208 (9th Cir.1988), which, as the majority notes, was the origin for equating the Youngberg standard with “conscious indifference.” See Maj. Op. at 1029. Then we noted that “[a]lthough the Conners opinion used the term ‘conscious indifference,’ both parties [in Neely ] used the term ‘deliberate indifference.’ ” 50 F.3d at 1507. We then explained the origin of “deliberate indifference” and its importation from Eighth Amendment to Fourteenth Amendment jurisprudence, but we did not reject — as we should have — the parties’ proposition that “deliberate indifference” was equivalent to “conscious indifference,” which we had earlier said was equivalent to the Youngberg professional standard.[15]
*1048 After confusing the standard we were actually applying — -by casting the Young-berg professional judgment standard in any name but its own — we raised a squall about whether any of the three standards require subjective awareness. No, we said, they do not. Neely, 50 F.3d at 1508 (“[T]he Youngberg professional judgment standard is necessarily an objective test.”); (“[0]ur Fourteenth Amendment jurisprudence has never required officials to have a subjective awareness of the risk of harm in order to be deemed ‘deliberately indifferent’ ”). Unfortunately, we then appear to have contradicted ourselves by stating that “in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring.” Id. (emphasis added). And then, to compound the problem, we held that one of the defendants in Neely was covered by qualified immunity expressly because she did not have subjective awareness of the risk of threat. Id. at 1511 (“[Tjhere is nothing in the record to establish that Hosley was personally apprised of the same evidence of Terry’s prior sexual assaults that Feinstein reviewed.”).
In other words, in Neely, we applied different levels of scrutiny to each of the four supervisor-defendants; we erroneously conflated two disparate standards with the Youngberg professional judgment standard; we contradicted ourselves on whether the proper standard required subjective awareness for a constitutional violation; and we contradictorily held that one supervisor-defendant was liable for risks he was not aware of but that another supervisor-defendant was not liable for risks of which she was not “personally apprised.” Id. Read faithfully, Neely does not serve to clearly establish anything and cannot be “faithfully appl[ied].” Maj. Op. 1081 n. 11.[16]
Unlike the majority, I do not see how Neely was sufficient to put LaFond on notice that she should have treated Grant or Ammons differently. In my opinion, Neely was not even correct. That aside, *1049 whatever Neely stands for, it does not “make[] crystal clear,” id., that by not indefinitely considering unfounded accusations against employees, by not personally reviewing Ammons’s file, and by not “ensuring” that her employees fulfilled their statutory obligations to report concerns of sexual abuse — concerns of which she was not aware — LaFond should have known that she was violating the Constitution. At the least, we should have granted qualified immunity to LaFond.
IV
For the reasons I have explained, I would hold that LaFond did not violate the Due Process Clause. In any event, I would find LaFond covered by qualified immunity. I respectfully dissent from that portion of the judgment and the majority opinion. For similar reasons, I agree that Webster is so protected, and I concur in that part of the majority’s opinion and judgment.

. I concur in that portion of the majority opinion reversing the denial of summary judgment as to Webster.

.The majority makes it sound as though Youngberg requires hospital administrators to act according to professional standards or risk § 1983 liability. This is not what Young-berg requires. Rather, as the Supreme Court noted, "the appropriate standard was whether the defendants’ conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of [patients] as to demonstrate that the [administrators] did not base their conduct on a professional judgment.” Youngberg, 457 U.S. at 314, 102 S.Ct. 2452 (quotation marks omitted) (emphasis added). The Constitution does not require hospital administrators to toe some industry-set line. Rather, as per the Supreme Court, the Constitution allows hospital administrators room to act — even to "depart” from professional judgment, practice, and standards — as long as those actions do not so depart that no professional judgment was exercised. See id.

. As the majority concedes, there is no "such [ ] 'golden code’ of professional conduct against which to measure LaFond’s actions.” Maj. Op. at 1034 n. 15. I think the majority has simply supplied the missing code; the majority claims the jury gets to make it up. Either way, there is no such code of professional judgment; either way, the majority is wrong.

. The majority writes: "Ironically, the dissent, like us, cannot articulate the code of professional conduct for administrators of residential health facilities, and yet the dissent somehow conclusively determines that, as a matter of law, LaFond did not depart from any such code.” Maj. Op. at 1034 n. 15. The absence of a professional standard means that LaFond prevails — that is precisely what it means that "decisions made by [LaFond] are entitled to a presumption of correctness.” Youngberg, 457 U.S. at 324, 102 S.Ct. 2452.

. I do not mean to imply that a state official’s inactions could never lead to liability under § 1983. See Maj. Op. at 1033 n. 14. I merely mean to point out that, without any references to professional standards or norms to guide its analysis, the majority’s list of La-Fond's apparently unconstitutional inactions reads like legal grapeshot.

. The majority’s assertion that, in finding La-Fond not protected by qualified immunity, it has not "conclusively prescribed] any particular administrative conduct,” Maj. Op. at 1035, is unreflective and naive. As the Supreme Court recently reminded us, rulings in qualified immunity cases "have a significant future effect on the conduct of public officials ... and the policies of the government units to which they belong.” Camreta v. Greene, 563 U.S. -, 131 S.Ct. 2020, 2030, 179 L.Ed.2d 1118 (2011). Such impact on future behavior is not an unintended consequence: "[T]hey are rulings self-consciously designed to produce this effect by establishing controlling law and preventing invocations of immunity in later cases.” Id.
Accordingly, courts routinely require state officials to act in accordance with the statements of constitutional law spelled out in previous appellate opinions denying qualified immunity. In fact, the majority's opinion here is such a case. According to the majority’s own analysis, without Neely v. Feinstein, 50 F.3d 1502 (9th Cir.1995), LaFond would be free from liability. See Maj. Op. at 1030-31. Because of Neely, she goes to trial. In the future, mental health professionals can ignore Ammons at their peril. The consequences of the majority’s ruling here could hardly be more certain.

. The majority makes much of the fact that LaFond knew that Resident A did not personally recant her allegations to CPS. See Maj. Op. at 1031-32. But CPS itself knew that Resident A did not personally recant her allegations to CPS, decided still to interview Grant, and then closed the case because the allegations were unfounded. LaFond is entitied to rely on CPS's professional judgment about when investigations are closed and allegations unfounded. While it might be understandable if LaFond still had some question about Grant even after the close of the investigation, it cannot be the case that the Constitution requires that she harbor such suspicions, much less that she take action against him.

. The majority responds to this point by saying, "We do not ... suggest that the administrator must disclose previous accusations of sexual misconduct to any other party, include the accused’s name on any public database, or impose any adverse consequence as a result of the accusation.” Maj. Op. at 1032-33 n. 13. If we accept this rebuttal, then we have accepted a reality in which hospital administrators may have to keep lists of individuals against whom unfounded accusations were made — so as to closely monitor the employees' future interactions with patients (as required by this majority) — but that, to comply with (at least Washington) state law, those lists might have to remain secret and unwritten. The majority is either blind to or comfortable with this future. I am not.

. The majority’s confident constitutional pronouncements are all the more remarkable fo*the fact that we do not know any of the actors here: We do not know the CPS investigators, their reputation and methods; LaFond and her staff; or Grant. Yet we have no difficulty finding that LaFond relying on CPS’s professional judgment was a substantial departure from her own accepted professional judgment.

. I am unpersuaded by the majority’s point that Humphries is not implicated because the majority is not requiring hospital administrators to "include the accused's name on any public database, or impose any adverse consequence as a result of the accusation." Maj. Op. at 1032-33 n. 13. It is not at all clear to me that assigning Grant to a different ward— what the majority is requiring, see id. at 1031-32 — would not have been an adverse employment action, for which LaFond might have opened herself to suit. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (finding that reassignment of duties, even to a position with the same job description, can be "materially adverse”); Humphries, 554 F.3d at 1201-02.

. Bereft of any standard against which to judge LaFond's professional judgment, the majority relies on the reports of two purported "experts” for support that LaFond’s conduct fell below the standard of care for hospital administrators. Maj. Op. at 1034 n. 15. But it does not appear from the record that the authors of these reports were ever qualified to opine on the standard of care required of hospital administrators. Rather, the record suggests that the authors are unqualified to evaluate LaFond's professional judgment as neither has studied hospital administration or has worked as a hospital administrator. As such, their unqualified opinions on La-Fond’s conduct should be afforded minimal weight.
Even if the witnesses were qualified, their reports are conclusory and do nothing to illuminate how, if at all, LaFond departed from the standard of care. They contain no discussion of industry standards, and no discussion — other than what we all can see through hindsight' — of what LaFond should have done differently. See, e.g., Report of Katherine A. Kent at 7 (“hospital administrators, including Ms. LaFond and Mr. Webster, failed to take any meaningful precautions to protect [Ammons]”); Report of Jane W. Ramon at 10 ("Mary LaFond and Norm Webster[] were grossly and extremely negligent in allowing a sexual relationship to develop between patient [Ammons] ... and adult male staff”).

. I should not need to make a counterargument at this level of factual granularity. See al-Kidd, 563 U.S. at-, 131 S.Ct. at 2084 ("We have repeatedly told courts — and the Ninth Circuit in particular — not to define clearly established law at a high level of generality.” (internal citations omitted)). The majority has cited no cases for the proposition that the Due Process Clause requires LaFond to specifically instruct her employees to report parent concerns to her. None. The *1046 majority does not even argue that Neely holds this. In light of the absence of case law imposing on LaFond such a requirement, I should not need to point out, as I have, that there is no indication in the record that La-Fond did not instruct her employees to report parent concerns. But the majority rests its denial of qualified immunity — and exposes LaFond to potential liability — at least in part on this spurious argument.

. The majority argues that at least one employee warned LaFond about "improper clinical staff handling of reported sexual incidents in the resident cottages.” Maj. Op. at 1023. But those warnings concerned patient-to-patient sexual impropriety, not staff-to-patient sexual abuse.

. Frankly, I have no idea what “much more” means in this context. Nor does Neely suggest anything “more” Feinstein could have done. This would be merely an intellectual lacuna, a mere judicial low point, except that now, the majority throws LaFond down that hole, which we made and did not fill.

. The Supreme Court rejected the “deliberate indifference” standard when it adopted the professional judgment standard in Youngberg, 457 U.S. at 312 n. 11, 102 S.Ct. 2452. Accordingly, we should have rejected that standard in Neely and not ambiguously entertained it, as we did. In fact, Neely relies on our decision in Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir.1986) for the proposition that "state officials" with “more than a mere suspicion that an attack will occur,” Neely, 50 F.3d at 1508, “must take steps to protect prisoners from the threat of serious harm or injury by other prisoners” id. (quoting in part Berg, 794 F.2d at 459 (emphasis in original)). Neely reasoned that Berg and other cases “amply demonstrate that ... in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring.” Neely, 50 F.3d at 1508. As such, Neely incorporated the Berg rule. But the rule Berg articulated *1048 (and Neely quoted) was the standard for "deliberate indifference," not the professional judgment standard. See Berg, 794 F.2d at 459 ("The ‘deliberate indifference’ standard requires ... [an official] have more than a mere suspicion that an attack will occur” (citation and quotations omitted)); see also Redman v. County of San Diego, 942 F.2d 1435, 1442 (9th Cir.1991) ("The Berg court ... defined what 'deliberate indifference' means in this circuit” (citing Berg)). Neely's citation to and adoption of Berg therefore operated to import the "deliberate indifference” standard into what should have been a professional-judgment analysis.

. I am not the first to point out the ambiguity in Neely's discussion of the applicable lqgal standard. In L.W. v. Grubbs, 92 F.3d 894 (9th Cir.1996), we rejected the argument that Neely established " ‘conscious indifference amounting to gross negligence’ ” as the standard for § 1983 liability. Id. at 897 (citing Neely, 50 F.3d at 1508 (internal quotations and citation omitted)). Neely, we explained, "was predicated on our reasoning in the first Wood v. Ostrander [879 F.2d 583 (9th Cir. 1989) ] opinion that we later amended,” id., the amendment of which "[t]he Neely panel should have been well aware.” Id. at 897 n. 3. When we amended Wood, we “step[ped] back from espousing gross negligence as the proper standard.” Id. But the Neely panel "[s]omehow ... omitted that from their decision.” Id. For this reason, the "[Neely] language ... is either incorrect to the extent that it approves the gross negligence standard, or it must be limited to the claims of inmate plaintiffs injured because of a miscarriage of the 'professional judgment of a [government] hospital official' in the context of a captive plaintiff.” Id. at 897. If we are not sure of the scope of Neely liability, it is unreasonable to assume LaFond would know better how Neely applies. See id. at 898 ("It is little wonder that our district courts have found difficulty in navigating Section 1983 damage claims waters.”).